1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    KIM LYNCH,                                Case No. 21-cv-02932-EMC

8                    Plaintiff,

9            v.                                **ORDER GRANTING DEFENDANT'S
                                               MOTION FOR SUMMARY
10   CITY & COUNTY OF SAN FRANCISCO,           JUDGMENT**

11                   Defendant.                Docket No. 30

12

13

14          Plaintiff Kim C. Lynch filed suit against Defendant City and County of San Francisco

15   ("the City") for various claims related to her employment with the City.  Docket No. 3 ("FAC").

16   Now pending before the Court is the City's motion for summary judgment and request for judicial

17   notice in support of its motion for summary judgment.  Docket No. 30 ("MSJ"); Docket No. 31

18   ("RJN").

19          For the following reasons, the Court **GRANTS** the City's motion for summary judgment

20   and **GRANTS** the City's request for judicial notice.

21                  **I.      FACTUAL AND PROCEDURAL BACKGROUND**

22   A.     Factual Background

23          Ms. Lynch is an African American woman hired by the City as a substance abuse

24   counselor in 2006.  Docket No. 30-2 (Declaration of Conor Dale ("Dale Decl.") Exh. 1

25   (Deposition of Kim C. Lynch ("Lynch Dep.")) at 46:2–46:11.  Ms. Lynch worked as part of the

26   Office Based Opiate Treatment ("OBOT") Program, which is a substance abuse and addiction

27   medicine treatment program operated by the City and the University of California, San Francisco

28   ("UCSF").  Docket No. 30-4 (Declaration of Dr. Joseph Pace ("Pace Decl.")) ¶ 6.

1    In 2013, Ms. Lynch was transferred to the Tom Waddell Urban Health Clinic ("the

2    Clinic") at 230 Golden Gate Avenue, San Francisco, CA 94102.  Lynch Dep. at 48:15–49:9.  The

3    Clinic primarily provides medical care to adults experiencing homelessness, residents of

4    supportive housing, and other members of the City's Tenderloin neighborhood community.  Pace

5    Decl. ¶ 3.  In her substance abuse counselor role, Ms. Lynch had a caseload of 40 to 67 homeless

6    patients.  Lynch Dep. at 91:22–25, 92:12–93:3.  She provided substance abuse counseling services

7    to patients, including collecting urine samples, ensuring patients were taking their medication,

8    referring patients to appropriate healthcare providers, coordinating with doctors and social

9    workers, and completing paperwork for treatment plans and counseling documentations.  Lynch

10   Dep. at 89:17–90:25.  She worked with nurses, psychologists, social workers, and doctors within

11   and outside the City.  Lynch Dep. at 90:8–11.

12        While in the OBOT Program, Ms. Lynch was supervised by UCSF personnel.  Docket No.

13   30-1 (Declaration of Natalie Bradley ("Bradley Decl.")) ¶ 3.  Ms. Lynch worked from 7:00AM to

14   4:00PM, Monday through Friday.  Lynch Dep. at 63:4–9.  She did not work overtime.  Lynch

15   Dep. at 104:15–17.  Ms. Lynch worked alongside City nurse Margaret Farny from 2006 to 2019.

16   Lynch Dep. at 65:17–14.  After Farny retired, Ms. Lynch worked with City nurse Sheryl Castro.

17   Lynch Dep. at 65:12–19.  Ms. Lynch was not required "to perform duties that [she] believed were

18   beyond her job description."  Lynch Dep. at 103:25–104:6.  She was not "required to perform job

19   duties that [she] felt were menial or below [her] job duties."  Lynch Dep. at 104:7–10.  Ms. Lynch

20   was never "disciplined for any reason."  Lynch Dep. at 111:21–23.  She did not "ever receive a

21   negative performance appraisal."  Lynch Dep. at 115:13–15.

22        In response to the pandemic, UCSF management implemented remote and in-person

23   determinations for those in the OBOT program.  Natalie Bradley, Ms. Lynch's UCSF clinical

24   supervisor, determined that Ms. Lynch should be able to perform remote work on a part-time basis

25   during the pandemic.  Bradley Decl. ¶¶ 7–8.  However, Ms. Lynch was specifically responsible for

26   maintaining the confidentiality of patient substance abuse records under "local, state and federal

27

28

United States District Court
Northern District of California

2

confidentiality regulations," including 42 C.F.R. Part 2.[1]  Docket No. 30-2 Exh. 2 (DPH Job Description for Substance Abuse Counselors).  Accordingly, her remote work determination was not immediately implemented because "there was not a laptop computer immediately available . . . that could safely and securely store confidential substance abuse patient records . . . to provide to Ms. Lynch to perform remote work and [Bradley] needed to coordinate with, and inform, City of San Francisco representatives regarding [her] decision to offer Ms. Lynch the opportunity to perform remote work."  Bradley Decl. ¶ 9.  Bradley also explains that "[i]n order to limit Ms. Lynch's exposure to the coronavirus, many of Ms. Lynch's clinical responsibilities were modified during periods of the coronavirus pandemic, such as Ms. Lynch not having to have face to face meetings with patients and not taking and processing patient urine samples."  Bradley Decl. ¶ 13.  After an appropriate laptop was procured a few months later, Ms. Lynch was offered the opportunity to perform remote work on a part-time schedule.  Lynch Dep. at 213:3–15.  Ms. Lynch declined: "But by this time, I said, 'Forget it. I'll stay here and work on the front lines.'"  Lynch Dep. at 213:3–15.  City nurse Sheryl Castro also performed in-person throughout the pandemic.  Bradley Decl. ¶ 15.  During the pandemic, Ms. Castro was deployed to other homeless housing sites, thus increasing Ms. Lynch's workload for reasons that Ms. Lynch asserted did not have "anything to do with race."  Lynch Dep. at 99:12–102:10, 102:25–103:18.  Other than that period, Ms. Lynch testified that her job duties did not change.  Lynch Dep. at 103:19–23.

Ms. Lynch also participated in racial and equity groups for labor management that met about five times between 2016 and 2019.  Lynch Dep. at 116:18–117:12.  At one point, an employee group was set up to discuss "institutional structural racism, about discriminatory practices, about not having any Black doctors, no Black nurses, no Black psychiatrists, no Black social workers."  Lynch Dep. at 68:17–19.  The group consisted of employees of different races.  Lynch Dep. at 69:19–74:3.  Medical Director Joseph Pace "regularly met with Ms. Lynch and other employees in the Clinic employee group [] to discuss and attempt to address their concerns

---

[1] Under 42 C.F.R. Part 2, a healthcare provider must maintain "restrictions upon the disclosure and use of substance use disorder patient records."  42 C.F.R. Part 2 § 2.2(a).  There are fines and criminal penalties for violating this regulation.  42 C.F.R. Part 2 § 2.3.

regarding employee diversity and employee retention." Pace Decl. ¶ 10. The group disbanded before the pandemic because "it wasn't going in the right direction," because "the suggestions that [the employees] came up with, Dr. Pace never followed through," and because the members "got frustrated and . . . start[ed] dropping off the group." Lynch Dep. at 74:9–77:14.

While working at the Clinic, eight African American patients complained to Ms. Lynch that they had been denied medical care. Lynch Dep. at 178:10–193:16. Ms. Lynch and other caregivers met with Alice Chen and Roland Pickens, representatives of the Department of Public Health's San Francisco Health Clinic—which encompasses the Clinic within its network. Lynch Dep. at 205:7–206:6; Docket No. 30-5 (Declaration of Roland Pickens ("Pickens Decl.")) ¶ 2. In 2018, the City launched a two-month investigation into the complaints, interviewing caregivers at the Clinic, evaluated its caregiving records of services to African American patients, and found "no indication of racial bias in restrictions or denials of services to African American patients." Pickens Decl. ¶ 4. Pickens assisted in the investigation. Pickens Decl. ¶ 4.

Ms. Lynch also participated in several hiring panels for Clinic positions. Lynch Dep. at 117:17–19. She testified that she agreed with all the hiring panels' selections, including the selections of nurse Sheryl Castro and Dr. Royce Lin. Lynch Dep. at 117:12–120:19; 162:16–20. However, Ms. Lynch "disagree[d] with it" in that there were "no Black applicants." Lynch Dep. at 162:19–20. Ms. Lynch testified that she did not know "whether any Black applicants applied for the job in the first place" but repeatedly asked the question "Where are the Black applicants?" to the panel members. Lynch Dep. 163:7–166:3. She also testified that a "Black psychiatrist . . . came back there after his internship and told [Lynch]" that he applied for a job with the Clinic and was not hired. Lynch Dep. 166:4–23. Ms. Lynch testified that during the interview of Dr. Justin Morgan, an African American man, panel member Rebecca Silverman, a white manager, said, "I am scared of him." Lynch Dep. at 174, 178:1–9.

Ms. Lynch also makes reference to several other separate incidents related to her employment at the Clinic:

During the December 2017 Clinic workplace holiday party, Donna James attempted to enter the restaurant at which the party was held. Docket No. 32-1, Exh. B (Deposition of Donna

United States District Court
Northern District of California

James "James Dep.") at 309:5–16.  Ms. James testified that as she "walked through the door, security guard grabbed my arm and said to somebody else, 'Is she an employee here,' with my City badge on and would not let me in.  And Dr. Morgan was right on side of me.  And he denied entry, so we left."  James Dep. at 310:3–8.  Ms. James testified that she does not know whether the security guard was a City employee.  James Dep. at 311:20–22.  Ms. James testified that she told Clinic Manager Rebecca Silverman about the incident immediately afterwards but did not receive any follow-up response.  James Dep. at 316:18–317:5.

Ms. Lynch also asserts that a reoccurring problem at the Clinic was that African Americans were hired but quickly dismissed while on probation.  For instance, Charles Jones was put on probation for not "doing the work properly" and was released during probation.  Lynch Dep. at 120:20–122:23.  Jawdean Bean was also discharged from her job as a social worker during probation.  Lynch Dep. at 120:20–121:18, 133:14–18; Docket No. 32-2 (Declaration of Kim Lynch ("Lynch Decl.")) ¶ 6.  Ms. Lynch also testified that two doctors—Maishia Davis and Lamercie Lamire—departed City employment in 2019.  Lynch Dep. at 169:21–171:8.

Additionally, Ms. Lynch asserts that she learned of an incident of "an emotional outburst and confrontation" between Jones and another employee Steven Tam.  Lynch Dep. at 112:3–25; Lynch Decl. ¶ 7.  Ms. Lynch did not witness the incident.  Lynch Dep. at 112:21–25.  Ms. Lynch later witnessed Mr. Tam "behaving bizarrely, screaming and yelling [and] locking himself in his office."  Lynch Decl. ¶ 7.

Lastly, Ms. Lynch asserts that she and two other African American employees Brenda Barros and Cheryl Thornton met with the Director of the Department of Public Health Dr. Grant Colfax on November 10, 2019.  Lynch Decl. ¶ 8.  They expressed concerns about Black and African American employees passed over for career opportunities, silenced or overlooked, failed to be recruited and retained, and have unaddressed health disparities.  Lynch Decl. ¶ 8.  Ms. Lynch asserts that a few months later, on January 10, 2020, she again confronted Dr. Colfax on his visit to the Clinic about the dismissal of African American employees during probation.  Lynch Decl. ¶ 9.

Ms. Lynch "had planned all [her] life to retire at [age 62]," which she voluntarily did on

September 30, 2021.  Lynch Dep. at 46:21–47:5.  After retirement, she worked "with UCSF, but in the same clinic."  Lynch Dep. at 46:20–21.

B.   <u>Procedural History</u>

Ms. Lynch filed her original complaint on April 20, 2021.  Docket No. 1.  She then filed an amended complaint, alleging (1) race-based hostile work environment in violation of the Fair Employment and Housing Act ("FEHA") and 42 U.S.C. § 1983 ("§ 1983"), (2) disparate treatment discrimination under FEHA and § 1983, (3) retaliation under FEHA, § 1983, and California Health and Safety Code § 1278.5, (4) disparate impact discrimination under § 1983, and (5) failure to prevent discrimination and harassment from occurring under FEHA.  FAC ¶¶ 47–133.

The City filed a motion for summary judgment on October 6, 2022.  Docket No. 30 ("MSJ").  The City also filed a request for judicial notice the same day.  Docket No. 31 ("RJN").  Ms. Lynch filed an opposition.  Docket No. 32 ("Opp.").  The Court now considers these motions.

## II.   <u>LEGAL STANDARD</u>

A.   <u>Motion for Summary Judgment (Rule 56)</u>

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B.      Request for Judicial Notice (Fed. Rule of Evidence 201(b))

        The Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid.  201(b).  However, to the extent any facts in documents subject to judicial notice are subject to reasonable dispute, the Court will not take judicial notice of those facts.  *See Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) ("A court may take judicial notice of 'matters of public record' . . . [b]ut a court may not take judicial notice of a fact that is 'subject to reasonable dispute.'") (first quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); then quoting Fed. R. Evid.  201(b)), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

### III.      DISCUSSION

A.      Request for Judicial Notice

        As a preliminary matter, this Court grants the City's request for judicial notice in support of the City's motion for summary judgment.  The Court may take judicial notice of a public record that is not subject to reasonable dispute.  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).  The Court may also take judicial notice of government records appearing on a government website when the authenticity of the site is not disputed.  *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).  Both the Article X of the Charter of the City and County of San Francisco and the City and County of San Francisco Civil Service Rule 103 are public records that appear on undisputed government websites.  Docket No. 31, Exh. A–B.  The Court takes judicial notice of both.

B.      Ms. Lynch's Failure to Exhaust FEHA Administrative Remedies

        In its motion for summary judgment, the City asserts that Ms. Lynch failed to file a timely administrative charge before the California Department of Fair Employment and Housing ("DFEH") before filing her action for a FEHA violation in federal court.  MSJ at 20.  "It is fundamental that where an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act."  *Okoli v. Lockheed Tech. Operations Co.*, 36 Cal. App. 4th 1607, 1612 (1995) (internal quotation marks

1   omitted).  "Under California law, an employee must exhaust the administrative remedy provided

2   by the Fair Employment and Housing Act, by filing an administrative complaint with the

3   California Department of Fair Employment and Housing and obtaining DFEH's notice of right to

4   sue before bringing suit on a cause of action under the act or seeking the relief provided therein."

5   *Id.* at 1613 (citing Cal. Gov't Code §§ 12960, 12901, 12925, 12965(b)) (cleaned up).

6        Ms. Lynch has satisfied this prerequisite.  The administrative exhaustion requirement is

7   met if the FEHA claims in a judicial complaint are "like and reasonably related to" the claims in

8   the administrative complaint.  *Wills v. Superior Ct.*, 195 Cal. App. 4th 143, 154–55 (2011)

9   (permitting claims in a judicial complaint that are "within the scope of the EEOC charge, any

10  EEOC investigation actually completed, or any investigation that might reasonably have been

11  expected to grow out of the charge").  Here, in her administrative complaint, Ms. Lynch expressly

12  alleged racial discrimination, harassment, and retaliation against the City and County of San

13  Francisco, which are like and reasonably related to the claims in her judicial complaint.  Docket

14  No. 30-2 Exh. 1-11 (DFEH Complaint).

15  C.   <u>Ms. Lynch's Harassment and Hostile Work Environment Claim</u>

16       Ms. Lynch asserts that the City subjected her to a race-based hostile work environment in

17  violation of § 1983 and FEHA.  Under FEHA, "harassment" in the workplace can take the form of

18  "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter

19  the conditions of the victim's employment and create an abusive working environment."  *Rehmani*

20  *v. Superior Ct.*, 204 Cal. App. 4th 945, 951 (2012) (cleaned up).  Harassing conduct takes place

21  "outside the scope of necessary job performance, conduct presumably engaged in for personal

22  gratification, because of meanness or bigotry, or for other personal motives."  *Id.* (citing *Reno v.*

23  *Baird*, 18 Cal. 4th 640, 646 (1998)).  "Thus, harassment focuses on situations in which the social

24  environment of the workplace becomes intolerable because the harassment (whether verbal,

25  physical, or visual) communicates an offensive message to the harassed employee."  *Id.* (citing

26  *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 707 (2009)).

27       Ms. Lynch has not shown triable issues of fact of harassment.  To establish a harassment

28  claim under Title VII, a plaintiff must prove that the harassing conduct is severe *and* pervasive.

United States District Court
Northern District of California

*Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000).  To establish a harassment claim under FEHA, a plaintiff only needs to prove that the harassing conduct is severe *or* pervasive. *Sheffield v. Los Angeles Cnty. Dep't of Soc. Servs.*, 109 Cal. App. 4th 153, 161, 134 Cal. Rptr. 2d 492, 498 (2003) ("However, the harassment need not be severe and pervasive in order to impose liability; either severe or pervasive will suffice."); *see also Nichols v. Azteca Rest. Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001) (The required level of severity or seriousness "varies inversely with the pervasiveness or frequency of the conduct.").  "To fulfill the 'severe or pervasive' prong, a plaintiff must show a 'concerted pattern of harassment of a repeated, routine, or generalized nature.'" *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d 694, 703 (N.D. Cal. 2014) (internal citation omitted).  In assessing whether Ms. Lynch has made out a colorable claim of hostile work environment, the Court considers the "frequency, severity and level of interference with work performance among the factors particularly relevant to the inquiry." *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000).  Ms. Lynch has not presented evidence that her workplace environment was rife with severe or pervasive harassment such that a reasonable jury could find in her favor, even under the more lenient FEHA standard.

First, Ms. Lynch alleges "[o]stracism of Black employees by their managers."  FAC ¶¶ 58(a), 97(a).  But Ms. Lynch testified that she was very involved with Clinic employees and groups: she participated in equity groups, Lynch Dep. at 116:18–117:12, 69:19–74:3; she met with medical directors, Lynch Dep. at 74:9–77:14; Lynch Decl. ¶ 8; she participated in hiring panels for Clinic positions, Lynch Dep. at 117:17–19.  Ms. Lynch fails to provide any specific data or evidence that Black employees were unfairly treated generally or ostracized on a systemic basis.  Regarding the allegation of non-hires, Ms. Lynch admits that she agrees with the hiring panel's hiring decisions, Lynch Dep. at 162, and admits that she doesn't know if any Black applicants applied in the first place, Lynch Dep. at 163.  Regarding the allegation of discharges, Ms. Lynch admits that of the two examples she cites, one discharge was because the employee "wasn't doing the work properly,"  Lynch Dep. at 122, and the other she had no "firsthand information" of, Lynch Dep. at 133–34.  She presents no evidence of actual unlawfully discriminatory personnel decisions.  *See Amador v. SBE Ent. Grp., LLC*, No. 19-CV-06414-WHO, 2021 WL 2936735, at

9

*18 (N.D. Cal. July 13, 2021) (citing *Kelley v. The Conco Companies*, 196 Cal. App. 4th 191, 212 (2011) ("Mere ostracism is insufficient to support a claim for hostile work environment.").

Second, Ms. Lynch alleges "[p]ublic humiliation of Black employees." FAC ¶ 58(b), 97(b). Specifically, she points to the "the public humiliation of Black coworkers James and Morgan outside the 2017 Holiday Party." Opp. at 17. As a preliminary matter, Ms. Lynch has presented no evidence that the security guard worked for the City rather than the restaurant or event service. James Dep. at 309:17–310:1. Ms. Lynch has not presented evidence or argument that the City should be held responsible for the actions of non-employees. The parties also dispute whether incidents occurring outside Ms. Lynch's presence and not targeting Ms. Lynch may be considered. MSJ at 9; Opp. at 16. Ms. Lynch cites *Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511, 519 (1998) for the proposition that "[t]he plaintiff's work environment is affected not only by conduct directed at herself but also by the treatment of others . . . a reasonable person may be affected by knowledge that other workers are being [] harassed in the workplace, even if he or she does not personally witness that conduct." Opp. at 16. *Beyda* also explains that "[i]f, however, the plaintiff neither witnesses the other incidents nor knows that they occurred, those incidents cannot affect his or her perception of the hostility of the work environment. The objective severity of harassment must be judged from the perspective of a reasonable person in plaintiff's position." 65 Cal. App. 4th at 519. Here, it is undisputed that Ms. Lynch did not witness Ms. James and Mr. Morgan's interaction with the security guard outside the 2017 holiday party. Although Ms. James later told Ms. Lynch of the incident, hearing about this incident does not rise to the level of severe or pervasive workplace harassment: a reasonable person would not find that hearing about a single verbal incident that occurred outside the workplace, by a security guard who may not be affiliated with the City, that she did not personally witness, would cause her own work environment to become "permeated by [] harassment." *See Fisher v. San Pedro Peninsula Hosp.*, 214 Cal. App. 3d 590, 613 (Ct. App. 1989) (" It is not sufficient to plead that a pattern of sexual harassment existed at [the workplace]. [Plaintiff] being percipient, should have been able, and was properly required by the law and motion judge, to allege sufficient facts to establish that her work environment was permeated by [] harassment."). Moreover, Ms. Lynch does not establish

10

United States District Court
Northern District of California

that the harassment was objectively severe or pervasive in a "concerted pattern of harassment of a repeated, routine, or generalized nature.'" *Landucci*, 65 F. Supp. 3d at 703.

Third, Ms. Lynch alleges that the City "[r]equir[ed] Black employees to perform menial work below their job classifications." FAC ¶¶ 58(c), 97(c). But in her deposition, Ms. Lynch contradicts this assertion. She expressly stated that she was not "required to perform job duties that [she] felt were menial or below [her] job duties." Lynch Dep. at 104:7–104:10. She also provides no evidence that other Black employees were required to do so.

Fourth, Ms. Lynch alleges that "[d]uring the time of the COVID-19 pandemic, [the City] require[ed] Black employees to perform duties that management knew exposed them to infection." FAC ¶ 58(d), 97(d). Although she asserts that "being required to work on site during the COVID lockdown, as well being ordered no to wear a mask" amounted to racial harassment, Opp. at 16, she presents no evidence that masking decisions or enforcement were based on racial criteria—*i.e.*, that only Black employees were ordered not to wear a mask. Lynch Dep. at 212:11–23, FAC ¶ 36.

Fifth, Ms. Lynch has not shown that the City made remote work determinations during the COVID-19 pandemic on a racially discriminatory basis. During the pandemic, remote work determinations were common and necessary personnel management decisions. Here, Ms. Lynch's clinical supervisor determined that Ms. Lynch could perform remote work part-time. Bradley Decl. ¶¶ 7–8. Although "[t]his was not immediately implemented because 'there was not a laptop computer immediately available . . . that could safely and securely store confidential substance abuse patient records,'" Ms. Lynch has not alleged that this delay was due to race—in fact, non-Black City nurse Ms. Castro also performed in-person throughout the pandemic. Bradley Decl. ¶ 15. Moreover, Ms. Lynch's supervisor has explained that "[i]n order to limit Ms. Lynch's exposure to the coronavirus, many of Ms. Lynch's clinical responsibilities were modified during periods of the coronavirus pandemic, such as Ms. Lynch not having to have face to face meetings with patients and not taking and processing patient urine samples." Bradley Decl. ¶ 13. Ms. Lynch has not alleged specific facts otherwise. "[C]ommonly necessary personnel management actions such as hiring and firing, job or project assignments, . . . promotion or demotion, [and] performance evaluations . . . do not come within the meaning of harassment." *Lawler v.*

1   *Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013).

2          Sixth, Ms. Lynch alleges that the City "disrespect[ed] and refus[ed] to serve Black patients

3   and clientele."  FAC ¶¶ 58(e), 97(e).  At this point in the litigation, Ms. Lynch has "not issue[d]

4   any written discovery requests or take[n] deposition testimony regarding any specific instances of

5   a City employee denying medical care to African American patients or the reasons why such care

6   may have been denied."  Docket No. 30-2 (Declaration of Conor Dale ("Dale Decl.")) ¶ 9.  In her

7   deposition, Ms. Lynch explained that City representatives did not follow through on her

8   complaints: "Time and time again, going to all the people they tell us to go to, including Grant

9   Colfax, the board of supervisors, Michael Brown, Alice Chen, Roland Pickens, Rhonda Simmons,

10  Karen Hill, I feel that my voice don't matter.  I feel like I don't matter.  It's a hostile work

11  environment.  It's a hurtful work environment.  It's hurtful to see Black patients go through this,

12  and I've been doing this for years."  Lynch Dep. at 218:1–9.  According to Ms. Lynch, Micki

13  Callahan "didn't listen to us as Black employees."  Lynch Dep. at 318:10–17.  Dr. Colfax "did not

14  follow through on anything."  Lynch Dep. at 219:8–14.  The Board of Supervisors "did nothing."

15  Lynch Dep. at 219:15–23.  Dr. Pace "did nothing."  Lynch Dep. at 219:24–220:2.

16          But here, the City has proffered evidence that the City did investigate.  Department of

17  Public Health's San Francisco Health Clinic representative Roland Pickens launched a two-month

18  investigation into the complaints, interviewing caregivers at the Clinic, evaluated its caregiving

19  records of services to African American patients, and found "no indication of racial bias in

20  restrictions or denials of services to African American patients."  Pickens Decl. ¶ 4.  Medical

21  Director Joseph Pace "regularly met with Ms. Lynch and other employees in the Clinic employee

22  group 'TED' to discuss and attempt to address their concerns regarding employee diversity and

23  employee retention."  Pace Decl. ¶ 10.  Department of Public Health Director of Staffing Karen

24  Hill also met with Ms. Lynch and other employees to discuss their concerns.  Docket No. 30-3

25  (Declaration of Karen Hill ("Hill Decl.")) ¶¶ 7–8.  Ms. Lynch does not dispute that these

26  investigations and discussions occurred.  While she complains that nothing came of these efforts,

27  she has not presented any evidence that, *e.g.*, the investigation by Mr. Pickens which did not find

28  discriminatory treatment was inadequate.  Although she questions the investigation because she

United States District Court
Northern District of California

was not told of the results, the City found "no indication of racial bias in restrictions or denial of services to African American patients" and did not widely share the results of this investigation in general.  Pickens Decl. at 1.  And Ms. Lynch "did not issue any written discovery requests or take deposition testimony regarding any investigation that the City may have made in response to complaints about discriminatory patient care, the outcome of that investigation, or why the results of that investigation may not have been widely shared with City employees such as Ms. Lynch." Dale Decl. at 2.  Thus, she has presented no specific evidence of discrimination or of the inadequacy of the City's investigation.

A "failure to address" claim under FEHA would apply to employers who "fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring."  Cal. Gov't Code § 12940(k).  However, an employee's conclusory assertions of "inequitable" scheduling and assignments and "uncomfortable" interactions with her employer "do not establish a duty concern the matters on which she relies" under FEHA.  *Id.*  Likewise, Ms. Lynch has not established that the City has a duty of care to take all reasonable steps to prevent discrimination and harassment because she provides only conclusory assertions of a "hurtful" and "hostile" environment without establishing that such discrimination or harassment actually occurred.

Considering the working environment "in light of the totality of the circumstances," *Miller v. Dep't of Corr.*, 36 Cal. 4th 446, 462 (2005), Ms. Lynch has not presented sufficient non-conclusory evidence establishing a racially hostile working environment under either Title VII or FEHA.  The Court grants summary judgment in favor of the City on the harassment and hostile work environment claims.

D.     Ms. Lynch's Disparate Discrimination Claim

Ms. Lynch asserts that she suffered discrimination through adverse employment actions— being required to work in-person at the start of the pandemic, and workload increases at the start of the pandemic—on the basis of her race.  FAC ¶ 88.  Under the burden-shifting framework:

> Under *McDonnell Douglas*, a plaintiff alleging disparate treatment under Title VII must first establish a prima facie case of discrimination.  Specifically, the plaintiff must show that (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subject to an adverse employment action; and (4) similarly

13

> situated individuals outside his protected class were treated more
> favorably.  The burden of production, but not persuasion, then shifts
> to the employer to articulate some legitimate, nondiscriminatory
> reason for the challenged action.  If the employer does so, the
> plaintiff must show that the articulated reason is pretextual either
> directly by persuading the court that a discriminatory reason more
> likely motivated the employer or indirectly by showing that the
> employer's proffered explanation is unworthy of credence.

*Chuang v. Univ. of California Davis, Bd. of Trustees*, 225 F.3d 1115, 1123–24 (9th Cir. 2000)

(cleaned up); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Ms. Lynch does not establish a prima facie case of discrimination.  As to the first and

second prongs, Ms. Lynch does belong to a protected racial class and was qualified for her

position at the Clinic.  As to the third prong, Ms. Lynch was not subject to an adverse employment

action.  An adverse employment action must "materially affect the terms and conditions of

employment." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1036 (2005).  Ms. Lynch's

workload increased only during the start of the pandemic.  Lynch Dep. at 99:12–102:10, 102:25–

103:18, 103:19–23.  But this Court has found that a workload increase is a "mere inconvenience or

an alteration of job responsibilities." *Lindroos v. Bernhardt*, No. 20-CV-06897-EMC, 2021 WL

2322367, at *7 (N.D. Cal. June 7, 2021).  Indeed, the workload increase does not appear to be

adverse because Ms. Lynch did not work overtime, Lynch Dep. at 104:15–104:17, and did not

"ever receive a negative performance appraisal," Lynch Dep. at 115:13–115:15.  Even though Ms.

Lynch suffered a delay in being permitted to work remotely, the delay does not appear to be an

adverse consequence because Ms. Lynch later demonstrated that she did not assign much value to

the ability to work remotely when she refused the offer to work remotely once the appropriate

laptop was procured.  Lynch Dep. at 213:3–15.  In any event, as to the fourth prong, she does not

show that similarly situated individuals outside her protected class were treated more favorably in

this regard.  Although she argues that some non-Black Clinic employees were permitted to work

from home, Opp. at 9—such as Dr. Pace, Karen Gomez, Royce Lin, and Kim Pelish—none of

those individuals were similarly situated because they were doctors and nurses with different

responsibilities.  Lynch Dep. at 214:9–13; *id.* at 215:13–15 ("I'm not a nurse. I'm not in their

realm, their scope of work.  So I don't know what they were doing, but they were working from

home."); *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006) (requiring that "the individuals

United States District Court
Northern District of California

seeking relief must demonstrate, at the least, that they are similarly situated to those employees in all material respects").  Additionally, their remote work determinations were made by City employees.  Pace Decl. ¶ 13.  None of those four employees were supervised by UCSF employees under the OBOT program as Ms. Lynch was.  Pace Decl. ¶ 13.  Other similarly situated individuals—such as City nurse Ms. Castro, who Ms. Lynch worked with and who was not Black—also performed in-person throughout the pandemic.  Bradley Decl. ¶ 15.

Even if Ms. Lynch presented a prima facie case of disparate treatment by the City, the City articulates a legitimate, nondiscriminatory reason for the decisions.  As for the remote work determination, the City did determine to allow her to work remotely but delayed implementation because a compliant laptop was not immediately available.  That determination was based on the job responsibility and availability of secure at-home equipment.  Bradley Decl. ¶ 9.  As for the increased workload, the City has a legitimate reason for increasing Ms. Lynch's workload because the nurse that she worked with was deployed to other homeless housing sites during the start of the pandemic.  Lynch Dep. at 99:12–102:10.  In her deposition, Ms. Lynch admits that she does not believe that the deployment decision and the resulting increase in workload had "anything to do with race."  Lynch Dep. at 102:25–103:18.

Ms. Lynch has not presented any evidence that the City's articulated reasons for the delay in remote work or the changes in her responsibilities when her nurse was deployed to homeless housing sites were pretextual.

The Court grants summary judgment in favor of the City on the disparate discrimination claims.

E.     Ms. Lynch's Retaliation Claim

Ms. Lynch asserts that the City retaliated against her in violation of § 1983, FEHA, and California Health and Safety Code § 1278.5 because she "complained of unlawful employment discrimination on numerous occasions by way of different means and in different forums."  FAC ¶ 77.  Section 1278.5 "prohibits retaliation against any employee of a health facility who complains to an employer or government agency about unsafe patient care."  *Scheer v. Regents of the Univ. of California*, 76 Cal. App. 5th 904, 916 (2022).  "[T]o establish a prima facie case of retaliation

under the FEHA, a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). "The statute also provides a rebuttable presumption that discriminatory action was taken by the health facility, or by the entity that owns or operates that health facility if responsible staff had knowledge of the employee's complaint and the discriminatory action occurs within 120 days of the filing of the grievance or complaint by the employee." *Scheer*, 76 Cal. App. 5th at 916 (internal quotation marks omitted). "If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation drops out of the picture, and the burden shifts back to the employee to prove intentional retaliation." *Yanowitz*, 36 Cal. 4th at 1042 (internal quotation marks omitted). Courts analyze claims of retaliation using the same *McDonnell Douglas* burden shifting analysis as described above.

Ms. Lynch has not established a prima facie case of retaliation. Ms. Lynch asserts that she engaged in protected activity on two primary occasions: (1) when she met with Dr. Colfax on January 10, 2020, Lynch Dep. at 139:21–24, and (2) when she objected to Rebecca Silverman's "I am scared of him" comment to the hiring panel during an interview of Dr. Justin Morgan, an African American man, at an unspecified date, Lynch Dep. at 178:1–178:9. These complaints constitute protected conduct because Ms. Lynch reasonably believed that the City was discriminating. *Yanowitz*, 36 Cal. 4th at 1043 (holding that an employee has engaged in protected conduct when she has "complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA"). Additionally, whether the City subjected Ms. Lynch to adverse employment actions by increasing her workload and deciding on a hybrid schedule is the same as in the analysis as above. The Court adheres to its conclusion that Ms. Lynch suffered no adverse employment action.

Further, Ms. Lynch has not shown a causal link between her complaints and the City's actions. When asked in her deposition about her bases for her retaliation claim, Ms. Lynch replied:

United States District Court
Northern District of California

1    Q. Okay. Are you also claiming retaliation in this lawsuit?

2    A. Yes.

3    Q. Okay. What -- what do you believe you were retaliated against
     for? In other words, what action did you take that you believe was
4    the basis for retaliatory acts?

5    A. Because for me, crying out and speaking about this issue for a
     long time, the retaliation to me, they never did anything.
6
     Q. Aside from not responding to your complaints, not doing
7    anything, sweeping things under the rug, do you believe anything
     bad happened to you as a city employee because of your speaking
8    up and crying out, as you said?

9    A. Yeah, the hostile environment –

10   Q. Uh-huh.

11   A. the working conditions, the trauma, the biases. The not hiring
     Black doctors, nurses, social workers, psychiatrists. Not fulfilling
12   the needs of our Black patients. Not fulfilling the needs of having
     people that reflect the population you work with.
13
     Q. Why do you believe that those things happened because of the
14   complaints that you made?

15   A. 'Cause I'm Black.

16   Q. Any other –

17   A. I'm Black.

18   Q. Okay.

19   A. I'm Black. I'm Black. I'm Black. I'm Black.

20   Q. Okay.

21   A. I have no other way to explain it.

22   Lynch Decl. at 220:3–221:8.  These conclusory statements lack specific facts or documentation

23   and do not show causation between Ms. Lynch's complaints and the City's actions.

24   To be sure, Ms. Lynch may be entitled to a rebuttable presumption of retaliation.  The

25   alleged adverse employment actions likely took place within 120 days of Ms. Lynch's complaints.

26   The parties have not provided a precise date that the retaliatory conduct—her remote working

27   determination—took place, but the remote working determination at the start of the pandemic

28   (mid-March 2020) likely took place within 120 days of Ms. Lynch's meeting with Dr. Colfax

17

(mid-January 2020).  However, Ms. Lynch has not presented evidence that the responsible staff—her UCSF supervisors—had knowledge of her complaints to Dr. Colfax and Ms. Silverman.  Even if Ms. Lynch enjoys the rebuttable presumption of retaliation, there is no basis for finding causation.

The Court grants summary judgment in favor of the City on the retaliation claims.

F.      Ms. Lynch's Disparate Impact Claims

Ms. Lynch asserts that the City's practices had a disparate impact on Black employees in violation of FEHA.  FAC ¶¶ 83–93.  To establish a disparate impact claim under Title VII, a plaintiff must show: "(1) the existence of outwardly neutral practices; (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices; and (3) facts demonstrating a causal connection between the specific challenged practice or policy and the alleged disparate impact." *Arnold v. Sessions*, No. 4:18-CV-00553-KAW, 2018 WL 6728008, at *6 (N.D. Cal. Dec. 21, 2018).  Additionally, "[t]o state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class.  Where the challenged governmental policy is 'facially neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement only if it tends to show that some invidious or discriminatory purpose underlies the policy." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (internal citation omitted).

Regarding the Title VII claim, Ms. Lynch has no standing to assert wrongs done to others.  Ms. Lynch does not show that the alleged disparate impact—of fewer Black hires and shorter retention—has impacted Ms. Lynch herself.  She has been hired by the City and was employed until she voluntarily retired.  Ms. Lynch only alleges that she was denied permission to work from home, given an increased workload, and required to perform hazardous work, which have been addressed in the sections above.  FAC ¶ 88.  A plaintiff must identify a "specific employment practice" that is discriminatory.  *Freyd v. Univ. of Oregon*, 990 F.3d 1211, 1224 (9th Cir. 2021); *see also Stout v. Potter*, 276 F.3d 1118, 1124 (9th Cir. 2002) ("Plaintiffs generally cannot attack

an overall decisionmaking process in the disparate impact context, but must instead identify the particular element or practice within the process that causes an adverse impact.").  Ms. Lynch has failed to identify any specific City employment practices or policies that cause a disparate impact. Moreover, Ms. Lynch has failed to produce any evidence or data of a disparate impact caused by any City practices.  Although she alleges that the City hiring practices resulted in the disparate impact of "not having any Black doctors, no Black nurses, no Black psychiatrists, no Black social workers," Lynch Dep. at 68:17–19, she also testified that she did not know "whether any Black applicants applied for the job in the first place."  Lynch Dep. 163:7–166:3.  Ms. Lynch did assert that a "Black psychiatrist . . . came back there after his internship and told [Lynch]" that he applied for a job with the Clinic and was not hired, but without more, this is not enough to show that a "significantly adverse" impact on a protected group caused by the City hiring practices. Lynch Dep. 166:4–23.

Regarding the Equal Protection Clause claim, Ms. Lynch likewise fails to allege standing. Ms. Lynch only generally alleges that there is "a long-standing, deep-rooted policy and practice of employment discrimination against its Black employees in the Department of Public Health Department."  FAC ¶¶ 86–88.  It is unclear what City "policy" Ms. Lynch alleged caused her harm.  Nor has she provided any data or evidence of "disproportionate impact" or that an "invidious or discriminatory purpose underlies the policy."  *Lee*, 250 F.3d at 686.  Notably, Ms. Lynch has neither sought discovery on this claim nor briefed this claim in her opposition to the City's motion for summary judgment.

The Court grants summary judgment in favor of the City on the disparate impact claims.

G.    Ms. Lynch's *Monell* Claim Under § 1983

Ms. Lynch alleges that the City should be held liable under § 1983 for its policies of discrimination as demonstrated in its decision that she could not work remotely following her two discussions with Dr. Colfax.  Under § 1983, a municipal government can be held liable if a plaintiff can demonstrate that a deprivation of a federal right occurred as a result of a "policy" of the local government's legislative body or of local officials with "final policymaking authority" over the decision in question.  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658,

692 (1978); *St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). Municipalities, however, cannot be held liable under § 1983 for constitutional torts merely on a theory of respondeat superior simply as a result of employment status. *Monell*, 436 U.S. at 692. The Ninth Circuit has held that municipal liability under *Monell* may be established in one of three scenarios: (1) "a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity;" (2) "the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy;" or (3) "an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992).

First, Ms. Lynch has not set forth evidence that a City employee committed a constitutional violation according to a formal policy or longstanding custom. The Court has already rejected each of Ms. Lynch's underlying constitutional claims above. And there is no evidence of any formal government policy to discriminate in its decisions about remote working during the pandemic. Nor is there any specific non-conclusory evidence that the City has a longstanding custom of constitutional violations "so widespread in usage as to constitute the functional equivalent of an express policy." *Choate v. Cnty. of Orange*, 86 Cal. App. 4th 312, 328, 103 Cal. Rptr. 2d 339, 350 (2000). Ms. Lynch asserts a single instance of a purported constitutional violation for her *Monell* claim: the decision prohibiting her from immediately working remotely during the pandemic. Even assuming that this decision constituted a constitutional violation, a plaintiff cannot rely solely on a single decision to infer a longstanding custom of discrimination. *Thomas v. City of Chattanooga*, 398 F.3d 426, 433 (6th Cir. 2005). Although Ms. Lynch cites to *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S. Ct. 1292, 1298, 89 L. Ed. 2d 452 (1986) to show that "even a single decision by such a body unquestionably constitutes an act of official government policy," Opp. at 7, upon closer examination, *Pembaur* permits "a single decision" to prove a *formal government policy*, not to prove a *longstanding custom*. Thus, by showing only a single violation, Ms. Lynch has not presented enough evidence

United States District Court
Northern District of California

20

United States District Court
Northern District of California

for a *Monell* claim under the first scenario.

Second, Ms. Lynch has not set forth evidence that a City official with final policy-making authority acted according to official governmental policy.  The "authority to exercise discretion while performing certain functions does not make the official a final policymaker unless the decisions are final, unreviewable, and not constrained by the official policies of supervisors." *Kerr v. City & Cnty. of San Francisco*, No. C 10-5733 CW, 2012 WL 3877752, at *17 (N.D. Cal. Sept. 6, 2012) (internal citations omitted).  Ms. Lynch asserts that under *Kerr*, the Director of Health of the San Francisco Department of Public Health, Dr. Grant Colfax, is a final policymaker for personnel decisions.  Opp. at 8.  However, there is no evidence that Mr. Colfax was aware of and thus finalized the decision to permit but defer the ability of Ms. Lynch to work remotely.  Rather, it was Ms. Bradley and UCSF management that implemented the remote and in-person determinations for Ms. Lynch, including the determination that Ms. Lynch should be able to perform remote work on a part-time basis during the pandemic.  Bradley Decl. ¶¶ 7–8.  Ms. Lynch has not explained what part the City or Dr. Colfax played in the remote working decision, what actual discretion Dr. Colfax had, and what other regulations and policies govern his role in that decision.  Thus, Ms. Lynch has not presented enough evidence for a *Monell* claim under the second scenario.

Third, Ms. Lynch has not set forth evidence that a City official with final policy-making authority ratified a subordinate's unconstitutional decision.  As noted above, Ms. Lynch has not shown Dr. Colfax knew about and approved the delay in her remote work.

The Court grants the City's motion for summary judgment on the *Monell* claim.

///

///

///

///

///

///

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.     <u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** the City's motion for summary judgment and **GRANTS** the City's request for judicial notice.

This order disposes of Docket Nos. 30 and 31.  The Clerk shall enter Judgment and close the case.

**IT IS SO ORDERED**.

Dated: November 23, 2022

_____
EDWARD M. CHEN
United States District Judge